IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Joseph J. Burns | : | |
| | : | Chapter Seven |
| Debtor | : | Case No. 5-bk-07-50140 RNO |
| _____ | : | _____ |
| Commonwealth of Pennsylvania, Thomas | : | |
| W. Corbett, Jr. Attorney General | : | Adv. No. 5-ap-07-50121 RNO |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | **{Nature of Proceeding:** Amended |
| | : | Complaint to Determine Non- |
| Joseph J. Burns | : | Dischargeability pursuant to § 523(a)(2)(A)**}** |
| | : | |
| Defendant | : | |

## **Opinion**[1]

The Attorney General of the Commonwealth of Pennsylvania has, pursuant to its powers

under the *parens patriae* doctrine[2], objected to the dischargeability of certain citizens' unsecured

debts pursuant to 11 U.S.C. § 523(a)(2)(A)[3] on grounds the debts were incurred by false

pretenses, false representations or fraud.[4]   The debts arose out of alleged construction contract

breaches and allegedly substandard construction work performed by the Debtor, Joseph J. Burns

---

[1]Drafted with the assistance of Kathryn F. Evans, Law Clerk.

[2]The Court held a hearing on May 20, 2008 and found the Commonwealth to have standing under the
*parens patriae* doctrine.  *Parens patriae*, literally meaning "parent of his or her country", originates from the English
common law where the King possessed the "royal prerogative" to act on behalf of juveniles and the insane. Blacks
Law Dictionary 1144 (8th Ed. 2004).  Under the doctrine, a state may file suit in its own name to prevent or seek
relief from harm to its quasi-sovereign interests. *Hawaii v. Standard Oil Co of Cal.*, 405 U.S. 251, 257, 92 S.Ct.
885, 889 (1972).

[3]Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et
seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8,
119 Stat. 37 ("BAPCPA").

[4]Originally, the Commonwealth sought to have the debt deemed non-dischargeable under § 523(a)(2)(A),
(a)(6) and (a)(7).  The Court granted judgment on the pleadings against the Commonwealth on the (a)(7) claim,
finding that, at the time of the filing, there was no fine, penalty, or forfeiture due and owing to the Commonwealth,
but specifically withholding judgment on whether the post-petition action filed by the Commonwealth in state court
was proper.  Additionally, no argument was raised or made with regard to the (a)(6) claim, and thus, the Court
refrains from ruling on the other causes of action under the doctrine of judicial restraint.

(hereinafter the "Debtor"). A consolidated, two-day trial[5] was held on this matter beginning June 3, 2008. For the reasons stated herein, with exception of the debt owed to Erma Malo, all other debts will be discharged.[6]

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 28 U.S.C. § 157 (b)(2)(A), (I) and (O).

**Facts**

At trial, the Commonwealth presented four witnesses. Two of the witnesses, William Hodakowski and Robert Coleman, contracted with the Debtor directly. Tim Roberts was a contractor later hired by Mr. Coleman to assess the damages to his property caused by Debtor's substandard work. Additionally, the Commonwealth called John Dunn, a Senior Consumer Protection Agent for the Office of the Attorney General. Mr. Dunn's testimony was focused principally on the elements of § 523(a)(7) and, thus, is not relevant to the § 523(a)(2) claim addressed herein.

**1) Robert Coleman.**

Robert Coleman, a Pennsylvania resident residing in Duryea, filed a complaint with the Bureau of Consumer Protection against the Debtor and Custom Construction Corporation[7] for what he viewed as substandard construction work on his mobile home. Mr. Coleman and the Debtor entered into a contract in January, 2005 for a new metal roof, siding, gutters, and skirting for the mobile home. Mr. Coleman paid the Debtor a total of $24,150.00 over the period of January 27, 2005 to July 1, 2005. The total contract price was set at $24,913.00. Mr. Coleman testified that near the end of the job, he was unhappy with the Debtor's work. He complained

---

[5]This matter was consolidated for trial with two other matters, *Malo v. Burns*, Case No. 5-07-ap-50119-RNO and *Litchkofski v. Burns*, Case No. 5-07-ap-50123-RNO pursuant to Fed. R. Bankr. P. 7042(1).

[6]It should also be noted that, although the Commonwealth's Amended Complaint sought to recover for the fraud perpetrated on Erma Malo, Lee Ann Litchofski and Rosemary Litchofski, the dischargeability of the debts owed to them will be discussed in separate Opinions filed contemporaneously with this Opinion to *Malo v. Burns*, Case No. 5-07-ap-50119-RNO and *Litchkofski v. Burns*, Case No. 5-07-ap-50123, respectively. Therefore, the Court will not discuss the merits of their claims again herein.

[7]It is unclear what the Debtor's relationship to the corporate entity Custom Construction Corporation is. Although all the parties appeared to understand the relationship, given that it was apparently a major issue litigated in the state court action, no evidence was presented to this Court regarding the Debtor's relationship to the entity.

-2-

about the exterior siding falling off, the roof eves not meeting and the gutters leaking. He repeatedly contacted the Debtor to ask him to personally come and inspect the work and arrange for the necessary repairs. Despite multiple assurances that he would appear with his subcontractor and repair all the problems, the Debtor continually called off the meeting either the day before the meeting or, sometimes even minutes before he was supposed to be at Mr. Coleman's home. As a result, Mr. Coleman stopped payment on the check constituting the final payment. Eventually, in November, 2005, Mr. Coleman contracted with a second contractor, Tim Roberts, to make repairs to his mobile home. Mr. Roberts testified extensively as an expert as to the substandard quality of the work performed by the Debtor, including problems with the siding and skirting. He also testified about the substandard job done on Mr. Coleman's roof, presenting photographic evidence of a metal roof which was rusting; which he testified would not happen had the roof been installed correctly. Mr. Roberts estimated that to fix the substandard construction job would cost approximately $24,255.50. (Pl.'s Ex. 23). At the time of trial, Mr. Roberts had not completed any repairs on Mr Coleman's mobile home.

**2) William Hodakowski.**

William Hodakowski, a Pennsylvania resident residing in Franklin Township, also filed a complaint with the Bureau of Consumer Protection regarding the Debtor. Mr. Hodakowski contracted with the Debtor to replace the roof on a storage shed located on his eighty-eight-year-old aunt's property. The shed was used to store farm equipment. Mr. Hodakowski lives on the property adjacent to his aunt and undertook the responsibility of finding someone to complete the job. On August 8, 2006, the Debtor came to Mr. Hodakowski's residence and they executed a contract (hereinafter "August Contract") that the Debtor had drafted for that purpose. (Pl.'s Ex. 25). Afterwards, Mr. Hodakowski gave the Debtor $3,000.00 as a deposit. Mr. Hodakowski testified that at no point during the negotiations did they discuss the residential or commercial nature of the contract nor either party's ability to cancel the contract. After the Debtor left Mr. Hodakowski's residence, Mr. Hodakowski reexamined the contract and began to have second thoughts. Concerned over the fact there was no price set out on his contract, he called the Credit Bureau and was alarmed by what he learned from them. After talking it over with his sister, Mr. Hodakowski decided that he wanted to cancel the contract. He called the Debtor at 7:30 a.m. on August 9, 2006, the day after the contract was signed, to cancel the contract. The same day, the

Debtor returned his call and informed Mr. Hodakowski that he was not allowed to cancel the contract because it was a commercial building[8] despite the fact, the contract itself notes "You, the buyer, may cancel this transaction at any time prior to midnight or [sic] the third business day after the date of this transaction." (Pl.'s Ex. 25). Later that day, when Mr. Hodakowski tried to stop payment on the deposit check, his bank told him that the check had already been cashed on August 8, 2006. Mr. Hodakowski then promptly went to the post office and sent the Debtor a registered letter cancelling the contract. That letter was never signed for. Despite Mr. Hodakowski's clear intention not to continue with the August Contract, the Debtor repeatedly called Mr. Hodakowski telling him he needed to start the roof job, to which Mr. Hodakowski replied that the parties did not have a contract due to the fact he had cancelled it.

**Analysis**

Section 523(a)(2) provides, in pertinent part, that:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt--
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

The objecting party bears the burden of proving by a preponderance of the evidence that the instant debt should not be discharged. *In re Graham,* 973 F.2d 1089, 1098 (3d Cir. 1992) citing *Grogan v. Garner,* 498 U.S. 279, 288-89, 111 S.Ct. 654, 660-61 (1991). Lastly, "exceptions to discharge are generally construed 'narrowly against the creditor and in favor of the debtor.' " *In re Mehta,* 310 F.3d 308, 311 (3d Cir. 2002) quoting *In re Pelkowski,* 990 F.2d 737, 744 (3d Cir. 1993).

---

[8]In fact, Mr. Hodakowski testified the building is not used for commercial purposes and it is just used to store his uncle's farm equipment; however, 99% of the equipment was never used. His uncle never wanted to get rid of anything when he quit farming, despite the fact that no farming activity had taken place on the property since at least 1972.

-4-

**A) Dischargeability under § 523(a)(2)(A).**

To prevail in seeking an exception to a debtor's discharge of debt under § 523(a)(2)(A), a creditor must prove the following elements:  (1) the debtor obtained money through representations which the debtor knew to be false; (2) the debtor possessed an intent to deceive; (3) the creditor justifiably relied on the false misrepresentation; and, (4) the creditor sustained damages as a result of the false misrepresentations.  See, e.g., *In re Casini*, 307 B.R. 800, 815 (Bankr. D.N.J. 2004); *In re Redden*, 234 B.R. 49, 50 (Bankr. D.Del. 1999) (citing *In re Haining,* 119 B.R. 460, 463 (Bankr. D.Del. 1990)); *In re DeBaggis*, 247 B.R. 383, 389 (Bankr. D.N.J. 1999); *In re Cohen*, 191 B.R. 599, 604 (D.N.J. 1996), aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).  The plaintiff must prove the above elements by a preponderance of the evidence.  *In re Cohn,* 54 F.3d 1108, 1114 (3d Cir. 1995).

**1) Did the Debtor Make False Representations with Intent to Deceive?**

The false pretense or misrepresentation must be both material and made with the intent to deceive the party to whom it was directed.  See *Field v. Mans*, 516 U.S. 59, 68, 116 S.Ct. 437, 442-43, 133 L.Ed.2d 351 (1995).  Intent may be inferred from the totality of the circumstances of the case.  *In re Cohn,* 54 F.3d at 1118-19.  There are two ways to prove fraud or misrepresentation in a case involving a contractor.  First, to show that the debtor entered into the contract with the intent of never complying with the terms; or second, that there was an intentional misrepresentation as to a material fact or qualification when soliciting or obtaining the work.  *In re Antonious,* 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006).  "A mere breach of the construction contract alone does not establish fraud or misrepresentation for purposes of section 523(a)(2)(A)." *Id.* at 181.

**a) Mr. Coleman.**

The Coleman action fails on this prong.  Although the Court was convinced that the work done on Mr. Coleman's home was in all likelihood substandard, the work was, in fact, completed and the Commonwealth did not prove by a preponderance of the evidence that the Debtor made any material misrepresentation to Mr. Coleman when soliciting the work.  In fact, almost no evidence was presented regarding the Debtor's initial transaction with Mr. Coleman.  The only facts presented were that Mr. Coleman saw a television advertisement in early 2005 for metal roofs and that he hired the Debtor to do repair work on his mobile home.  Because the Court

-5-

cannot find any material misrepresentation fraudulently enticing Mr. Coleman to enter into the contract in the first place, the debt will be discharged.

### b) Mr. Hodakowski.

Mr. Hodakowski also fails on this prong. Although the Court finds the Debtor may have wrongfully breached the August Contract by failing to abide by the contractual term permitting Mr. Hodakowski three days to rescind the contract, the complained of conduct does not rise to the level of fraud. I cannot find that the Debtor entered into the contract with an intent to not perform it. In fact, even after Mr. Hodakowski attempted to cancel the contract, the Debtor still contacted him in efforts to complete the contract. Additionally, there was no material misrepresentation made by the Debtor to Mr. Hodakowski. Mr. Hodakowski does not allege the Debtor enticed him to enter into this construction contract by making false representations such as his ability to obtain a permit, or regarding his qualifications or by affirmatively assuring him that if he did not want to continue with the contract he would be able to rescind it. On the contrary, Mr. Hodakowski testified the ability to rescind was never discussed during the August 8, 2006 negotiations and that it was not until after he had already decided to get out of the contract that he discovered the contract provision allowing him to terminate the contract within three days.

As stated above, generally, when determining whether a contractor committed fraud in connection with a construction project, the question pivots on whether during the negotiations the contractor induced the property owner into signing the contract by making material false representations, like falsely promising to obtain the necessary permits or overstating his qualifications. Here, although the Court finds the Debtor's failure to abide by the provision allowing Mr. Hodakowski to rescind the contract reprehensible, a mere breach of contract, without more, is insufficient for a § 523(a)(2)(A) nondischargeability claim. *In re Smith,* 281 B.R. 613, 616 (Bankr. W.D.Pa. 2002), *In re Emery,* 52 B.R. 68, 70 (Bankr. E.D.Pa. 1985)*, In re Fenninger*, 49 B.R. 307, 310 (Bankr. E.D.Pa. 1985), *In re Kalmar,* 18 B.R. 343, 346 (Bankr. E.D.Pa. 1982). As such, this debt will be discharged.

### Conclusion

In sum, although I find that the Debtor may have completed the Coleman construction work in a substandard manner, and that he in all likelihood breached the Hodakowski

construction contract, I cannot find that those misdeeds were committed with fraudulent intent nor that the parties' claims qualify as non-dischargeable debts pursuant to 11 U.S.C. § 521(a)(2)(A).

An order will be entered consistent with this Opinion.


Date: July 11, 2008


Robert N. Opel, II, Bankruptcy Judge

*This opinion is electronically signed and filed on the same date.* (BI)